**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| **v.** ) | **Criminal No. 19-cr-10421-DJC** |
| ) | |
| **(5) JOSE L. DIAZ FONTANEZ, and** ) | |
| **(9) MANUEL COLON,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                     **August 14, 2023**

## I.    Introduction

The United States has charged Jose L. Diaz Fontanez ("Diaz Fontanez") and Manuel Colon

("Colon"), as well as eleven co-defendants, in a superseding indictment alleging four conspiracy

charges and three substantive offenses. D. 19. Diaz Fontanez faces charges of conspiracy to

distribute and to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 (Count I)

and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and

(b)(1)(B)(ii) (Count V). Id. at 2–3, 9. Colon is charged with conspiracy to distribute and to possess

with intent to distribute cocaine (Count II) and conspiracy to distribute and to possess with intent

to distribute heroin and fentanyl in violation of 21 U.S.C. § 846 (Count III). Id. at 4–7.

Diaz Fontanez has moved to suppress the fruits of a seizure of a priority mail package

shipped to New Bedford of which he took possession. D. 378. Colon has moved to dismiss Count

III of the superseding indictment or, alternatively, to sever Count III, strike and/or dismiss any

1

reference in Count III to fentanyl, and/or for a bill of particulars.  D. 364.  Both Defendants seek

an evidentiary hearing on their respective motions.  D. 378 at 3; D. 364 at 37–42.  Colon also seeks

to unseal his motion to dismiss, D. 359 (renewed in D. 414), which like the other motions, the

government opposes.  For the reasons stated, the Court DENIES Diaz Fontanez's motion to

suppress, D. 378, DENIES Colon's motion to dismiss Count III of the superseding indictment and

DENIES the alternative relief that Colon seeks, except that it denies without prejudice the portion

of the motion regarding which transcripts and, in what form, any translated transcripts of the

February 14, 2019 call will be admitted at trial.  D. 364.  As to Colon's motion to unseal the motion

to dismiss, D. 414, the Court ALLOWS IN PART that motion to the extent explained in this

Memorandum and Order.

## II.    Factual Background

The Court summarizes the allegations in the superseding indictment as to the charges

against Diaz Fontanez and Colon.

On December 4, 2019, a federal grand jury returned a superseding indictment, D. 19,

charging thirteen defendants in seven counts.  As to the first conspiracy charge, the indictment

alleges in Count I that "[f]rom in or about June 2017 through at least December 2019, in New

Bedford, in the District of Massachusetts, and elsewhere," eight defendants including Diaz

Fontanez "conspired with each other and with other persons . . . to knowingly and intentionally

distribute and possess with intent to distribute a mixture and substance containing a detectable

amount of cocaine." Id. at 2.  "[Five hundred] grams or more of a mixture and substance containing

a detectable amount of cocaine" were reasonably foreseeable by and attributable to Diaz Fontanez

and five of his co-defendants.  Id. at 3.  Count V alleges a substantive charge against Diaz Fontanez,

namely that "[o]n or about December 3, 2018, in New Bedford, in the District of Massachusetts . . .

[he] did knowingly and intentionally possess with intent to distribute 500 grams or more of a

mixture and substance containing a detectable amount of cocaine." Id. at 9.  Both Counts I and V allege that Diaz Fontanez committed these offenses after being convicted of two serious drug or violent felonies, "for which he served more than 12 months of imprisonment (as to each) and for which he was released from serving any term of imprisonment related to that offense within 15 years of the commencement of the instant offense." Id. at 3, 9.

Colon is charged in other counts of the superseding indictment.  Count II charges that "[f]rom in or about February 2019 through at least December 2019, in New Bedford, Fall River, and Chicopee, in the District of Massachusetts, and elsewhere," six defendants including Colon "conspired with each other and with other persons . . . to knowingly and intentionally distribute and possess with intent to distribute a mixture and substance containing a detectable amount of cocaine" and that the conspiracy involved "500 grams or more of a mixture and substance containing a detectable amount of cocaine," id. at 4, and that quantity was reasonably foreseeable by and attributable to Colon and four other defendants.  Id. at 4–5.  Count III charges that "[f]rom in or about February 2019 through at least April 2019, in New Bedford, Fall River, and Chicopee, in the District of Massachusetts, and elsewhere," Colon and co-defendant Victor Alejandro-Carrillo ("Alejandro-Carrillo") "conspired with each other and other persons . . . to knowingly and intentionally distribute and possess with intent to distribute a mixture and substance containing a detectable amount of heroin . . . and a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide, also known as fentanyl." Id. at 6.  It is further alleged the conspiracy involved "100 grams or more of a mixture and substance containing a detectable amount of heroin," id., and "40 grams or more of a mixture and substance containing a detectable amount of . . . fentanyl," id., and this quantity was reasonably foreseeable by and attributable to Colon and Alejandro-Carrillo.  Id. at 6–7.

3

### A.      Relevant Facts as to Diaz Fontanez's Motion to Suppress

The following facts are drawn from the exhibits attached to Diaz Fontanez's motion to suppress, D. 378, as well as the government's opposition, D. 413.

#### 1.      Seizure of the Priority Mail Package

On November 26, 2018, a priority mail package bearing the tracking number 9505 8110 9897 8330 2396 91 (the "Package") shipped from Puerto Rico to New Bedford, Massachusetts. D. 413-2 ¶¶ 3, 9 (Foley Aff.).  The Package was addressed to "Angel T. Cortez 387 Ashley BLV. Apt. 2# New Bedford, MA. 02745." Id.; see D. 378-2 (Diaz Fontanez Aff.) ¶¶ 1, 3-4.  The Package listed its sender/return name and address as "Brenda Cortez URb. Golden Gate 1# Calle B-D 1 Caguas P.R. 00725" and weighed about eight pounds and 7.8 ounces.  D. 413-2 ¶¶ 3, 10.

Through the Database/Postal verification systems and the "CLEAR database,"[1] Postal Inspector James Foley determined the sender's address on the Package was not a valid address, but that the delivery address was valid and associated with the name "Angel Cortes-Nieves." Id. ¶¶ 11–12.  Agents further determined that at least three priority mail parcels previously had been sent to 387 Ashley Boulevard since June 2018, the most recent of which weighed roughly six pounds and had been addressed to "Angel Cortés Nieves." Id. ¶ 13.  On November 29, 2018, Foley took possession of the Package at a postal facility for further inspection; he observed that the Package had been heavily taped and upon a review of United States Postal Service ("USPS") records learned that the shipment had been paid for in cash. Id. ¶ 14.

Later that day, on November 29, 2018, Foley contacted Braintree Police Officer Richard Seibert to arrange for a dog sniff of the Package at the Braintree Post Office. Id. ¶¶ 15–16.  Officer

---

[1] According to Foley's affidavit, "CLEAR is a database of information drawn from public records, compiled by Thomson Reuters, and made available to subscribers." D. 413-2 ¶ 11 n.1.

Seibert arrived the same day with Lucky, a dog certified to detect the presence of narcotic odors. Id. The Package, as well as four other "control" packages, were placed in an area of the Braintree Post Office known to be free from contamination by narcotic odors. Id. ¶ 16. Officer Seibert examined the area with Lucky and observed Lucky react to the Package in a manner consistent with the presence of a narcotic odor. Id.

2.     *Agents Obtain a Search Warrant for a Search of the Package*

Thereafter, Foley applied for a warrant authorizing a search of the Package, D. 413-2, which issued on November 30, 2018. D. 413-1 at 1; D. 413-3 ¶ 18 (Foley Aff.). Foley's affidavit submitted in support of the search warrant recited the information about the Package cited above, D. 413-2 ¶¶ 10–16, his training and experience in the interception of illegal drugs and drug proceeds being transported through USPS mail and his prior interception of over 300 express or priority mail packages containing same, id. ¶¶ 1–2, use of priority mail for the delivery of contraband, id. ¶ 6, the common characteristics of past packages found to contain illegal drugs and drug proceeds, id. ¶¶ 6–8, and his belief that the Package contained illegal drugs. Id. ¶ 4. The agents executed the search warrant on the Package on November 30, 2018 and found two brick-shaped objects inside wrapped in plastic cellophane and each weighing over one kilogram. D. 413-3 ¶ 18. A sample from one of the bricks field-tested positive for cocaine. Id.

3.     *Delivery of the Package and Diaz Fontanez's Arrest*

In anticipation of delivering the Package as it was addressed, the agents repackaged the contents, rewrapping one of the bricks and replacing the other brick with a "sham" (non-controlled) substance. Id. ¶ 19. They also inserted a trip device to alert agents if the Package was opened, a GPS locator and audio locator to assist them in determining the location of the Package and ultraviolet detection powder to identify people who touched the contents of the Package once it

was delivered.  Id. ¶ 20.  On December 3, 2018, Foley obtained an anticipatory search warrant for 387 Ashley Boulevard in New Bedford, Massachusetts, Apartment 2S, the address to which the Package was addressed.  D. 413-4.  The same day, the Court issued the search warrant conditioned upon the delivery of the Package to an adult at that address and the entry of the Package into that address.  D. 413-4 at 6.

Later that same day, an agent posing as a USPS delivery person delivered the Package to that address.  D. 413-5 ¶¶ 13, 15.  Diaz Fontanez answered the door and took possession of the Package, taking it into the apartment.  D. 378-2 ¶ 4; D. 413-5 ¶ 15.  Several minutes later, agents observed Diaz Fontanez leave the apartment building through a rear door and enter a Dodge Durango.  D. 378-2 ¶ 5; D. 413-5 ¶ 16.  As Diaz Fontanez pulled out of the driveway, agents stopped his vehicle and observed the Package on the front passenger seat floor, D. 378-2 ¶ 6; D. 413-5 ¶ 16, now wrapped in plastic shopping bags.  D. 378-2 ¶ 5; D. 413-5 ¶ 16.  Agents arrested Diaz Fontanez and took him to the New Bedford police station for booking.  D. 378-2 ¶ 10; D. 413-5 ¶ 16.  Agents then executed the anticipatory search warrant and conducted a search of Apartment 2S at 387 Ashley Boulevard, where they located various forms of identification bearing Diaz Fontanez's name, five cellular telephones, and two open boxes of sandwich bags on the top shelf of the dining room closet.  D. 413-5 ¶¶ 17, 19.

### 4.      Diaz Fontanez's Statement to Police

At the New Bedford police station, after having his Miranda rights read to him in Spanish and having acknowledged that he understood them, D. 413-5 ¶ 20, Diaz Fontanez told agents that he lived by himself at 387 Ashley Boulevard, Apartment 2.  Id.  Diaz Fontanez said that he received the Package and had brought it with him to the Dodge Durango but did not know why he did so, id. at ¶ 21, and stated he did not know "Angel Cortez."  Id. ¶ 22.

**B.      Relevant Facts as to Manuel Colon's Motion to Dismiss**

The following facts are drawn from the exhibits attached to Colon's motion papers, D. 364, and the government's opposition, D. 382.

*1.      Investigation into Alleged Drug Transaction on February 14, 2019*

As part of the investigation of drug trafficking, agents received authorization for a Title III interception of wire and/or electronic communications of targets including but not limited to Alejandro-Carrillo and Colon.     D. 364-1  ¶¶ 23–26.    Those interceptions began with the authorization to intercept communications on Liu-Torres's telephone.  D. 364-1 ¶ 23.  On February 12, 2019, agents received initial authorization to intercept wire communications over TELEPHONE #5 and TELEPHONE #6, phones used by Alejandro-Carrillo.  Id. ¶ 26.  Through the wiretap, agents intercepted communications over Alejandro-Carrillo's phone from February 12, 2019 to March 13, 2019, including communications between him and Colon.  Id.

Of particular relevance to Count III, on February 14, 2019, agents intercepted a call from Colon to Alejandro-Carrillo in Spanish.  D. 364-1 ¶ 68; D. 382-1.  The agents had a line sheet prepared that transcribed the conversation and translated it from Spanish into English.  D. 382-1. The original translation of the call was as follows:

COLON:  And did you resolve with the other stuff?

ALEJANDRO-CARRILLO:  With what?

COLON:  With the stuff that you got yesterday.

ALEJANDRO-CARRILLO:  Yes, yes.  It's really good, [unintelligible].

COLON:  Yes.

ALEJANDRO-CARRILLO:  It's real good, better than the other stuff [unintelligible] you.

COLON:  [Unintelligible].

ALEJANDRO-CARRILLO:  They were asking me for some . . . the Domi (Dominican) was asking me for some this morning but I haven't answered to him because I don't know if you have any and I don't know at what price either.

COLON:  Okay.

ALEJANDRO-CARRILLO:  I didn't call him because of that, because I don't know the price and I don't know if you have any.  But the Domi has been calling me since 8 something in the morning, that fucker.

COLON:  The what?

ALEJANDRO-CARRILLO:  The Dominican.

COLON:  What?

ALEJANDRO-CARRILLO:  That he's asking me since the morning but I don't know if you have any and I don't know the price either.

COLON:  Oh . . . The ounce?

ALEJANDRO-CARRILLO:  No, no, the Domi buys from 100 and up.

COLON:  Oh, but of the white stuff?

ALEJANDRO-CARRILLO:  Yes.

COLON:  Oh, Manuelito [phonetic] has some.

ALEJANDRO-CARRILLO:  At how much?

COLON:  But how much does he want?

ALEJANDRO-CARRILLO:  Sometimes he asks for one and a half, 100, 125, it depends.

COLON:  **Oh, of the [unintelligible] . . . okay.**[2]  But that has to be like at 4 to be able to make some profit.

ALEJANDRO-CARRILLO:  Four (4), right?

COLON:  Yes.

---

[2] The emphasis added here highlights the changed language in the line sheet which Colon disputes as later line sheets inserted the word "hero" for unintelligible and the government relies upon this evidence that Colon and his co-defendant were discussing heroin at this point in the conversation.

8

ALEJANDRO-CARRILLO:  That's fine.  I always give it to him like that.

COLON:  Yes, with (4) we can get wherever he wants.

ALEJANDRO-CARRILLO:  Okay.  Let me hit him up now, let's see if he answers.

COLON:  Okay.

ALEJANDRO-CARRILLO:  Okay.

D. 382-1.

Within ten minutes, agents intercepted another call between Alejandro-Carrillo and Colon, stating in relevant part:

COLON:  Hello!

ALEJANDRO-CARRILLO:  150.

D. 364-1 ¶ 70.  Four minutes later, agents intercepted another call between Alejandro-Carrillo and Colon, stating in relevant part:

COLON:  You told me one and a half, right?

ALEJANDRO-CARRILLO:  Uh-huh.

Id. ¶ 72.  Shortly thereafter, agents intercepted another call between Alejandro-Carrillo and Colon, stating in relevant part:

COLON:  No, Papi.  He doesn't complete.

ALEJANDRO-CARRILLO:  He doesn't?  But how much does he have?

COLON:  But I think I can solve it for Saturday for sure, and with a better number.  It is Thursday already, Friday and Saturday.

ALEJANDRO-CARRILLO:  But he doesn't complete?  He only has a little bit, or how much does he have?  Do you know?

COLON:  I'm going to ask him now.

Id. ¶ 74.  Ten minutes later, agents again intercepted a call between Alejandro-Carrillo and Colon, stating in relevant part:

> COLON:  Tell him that is okay, [and] to have the tickets on hand.  I found someone else.
>
> ALEJANDRO-CARRILLO:  Mm-hmmm.
>
> COLON:  To resolve with someone else.  We give it to him right there and run.
>
> ALEJANDRO-CARRILLO:  Okay.  When . . .
>
> COLON:  I'm waiting for the call to know where I have to go.

Id. ¶ 76.

About one hour later, Alejandro-Carrillo and Colon exchanged additional calls in which they arranged, *inter alia*, to meet.  Id. ¶ 78.  At approximately 3:47 p.m., agents intercepted the following call between Alejandro-Carrillo and Colon:

> COLON:  I'm here, where are you?
>
> ALEJANDRO:  I'm here.
>
> COLON:  You are already there?  So stop behind the garage that is there, where the blue car is.  Stop there.

Id. ¶ 79.  Agents conducting surveillance then observed Colon standing outside the driver's side door of a Dodge Ram talking to Alejandro-Carrillo near the location of "Blue Bird Taxi Company" on 1551 Purchase Street, New Bedford, D. 364-1 ¶¶ 80–84; D. 364-2 ¶ 49, which is located near the residence of Ramon Serrano ("Serrano").  D. 364-1 ¶ 88.  Colon then walked away from the Dodge Ram and entered a Cadillac Escalade; both vehicles departed the area and drove north on Route 140 to a different location, exiting at Exit 7.  D. 364-1 ¶ 84; D. 364-2 ¶¶ 49–50.  The following day, agents conducting physical surveillance observed Colon walking to the rear of 1541 Purchase Street in New Bedford.  D. 364-1 ¶ 87.

On February 20, 2019,  police officers with the New Bedford Police Department executed a search warrant of the residence of Serrano located at 1541 Purchase Street and found approximately 926 grams of a substance believed to contain heroin and approximately 284 grams of a substance believed to be cocaine.[3]  Id. ¶ 88.  Two days later, on February 22, 2019, agents intercepted a call from Colon to Alejandro-Carrillo, wherein they discussed this arrest:

COLON:  Do you remember the guy we went to grab that from?

ALEJANDRO-CARRILLO:  Uh-huh.

COLON:  They grabbed him, you didn't see all the commotion?[4]

ALEJANDRO-CARRILLO:  Which one?

COLON:  The guy we went to grab the thing for your buddy, over there at exit 7.

ALEJANDRO-CARRILLO:  That is your friend?  Well, that is your friend's friend?

COLON:  What?

ALEJANDRO-CARRILLO:  That is your friend's friend?

COLON:  Yeah, the one that we went to grab that over there . . .

ALEJANDRO-CARRILLO:  Uh-huh.

COLON:  Well, they took him.

ALEJANDRO-CARRILLO:  Damn, shit, this is bad.

COLON:  They took a lot from him, 900 of the slow one and 250 white.

ALEJANDRO-CARRILLO:  Damn, he got fucked.

---

[3] According to the government's proffer, laboratory analysis of the substances retrieved from Serrano's residence indicated drug quantities of "approximately 544 grams of fentanyl (some of which also contained heroin) and 206 grams of cocaine."  D. 664 at 8.

[4] Colon disputes that he said "you didn't see all the commotion" during the February 22, 2019 call.  D. 364 at 8 n.2.  According to Colon, the appropriate translation is, "you didn't see it in the New Bedford Guide?"  Id.

> COLON:  He is fucked.  He had an ankle bracelet and parole.

Id. ¶ 89.  At the time of his arrest, Serrano had been on parole and resided at 1541 Purchase Street, id. ¶ 88, where Colon had been observed on February 15, 2019, id. ¶ 87, and near the location of Colon and Alejandro-Carrillo's meeting on February 14, 2019.  Id. ¶¶ 79–84**.**

### 2.    Revisions to February 14, 2019 Call Line Sheet

On February 16, 2019, agents prepared the first version of a line sheet translating and transcribing the February 14, 2019 call during which Colon and Alejandro-Carrillo initially began arranging the alleged drug transaction.  D. 382-1.  It is in this version in which the disputed line attributed to Colon says:

> COLON:  **Oh, of the [unintelligible] . . . okay**.  But that has to be like at 4 to be able to make some profit.

Id. at 2 (emphasis added).  As of February 22, 2019, the revised version of this excerpt of the call read as follows:

> COLON:  **Oh, of the hero . . . [ph] okay**.  But that has to be like at 4 to be able to make some profit.

D. 382-3 at 2.  The revision thus replaced the word "unintelligible" with "hero," suggesting this transaction ultimately was about heroin, not cocaine.

Subsequently, in a Title III affidavit by a Drug Enforcement Administration Task Force Officer, dated March 19, 2019, the affiant referenced this call, citing an excerpt of the transcript which, like the February 16, 2019 version of the line sheet, used the word "unintelligible" instead of "hero."  D. 364-1 ¶ 68.  A prior draft of the Title III affidavit dated March 7, 2019 included "hero," consistent with the February 22-revised version of the line sheet, and highlighted "hero" in yellow.  D. 364-5 ¶ 56.  The government avers that this highlight was made by the affiant to flag that "hero" reflected the latest iteration of the line sheet but that the prosecutor missed this

edit when revising the Title III affidavit and inadvertently included the superseded language of the February 16 line sheet.  D. 382 at 8.[5]

### III.    Procedural History

On December 4, 2019, a grand jury returned a superseding indictment charging Diaz Fontanez in Counts I and V and charging Colon in Counts II and III.  D. 19 at 2–3, 4-5, 9.

Diaz Fontanez has moved to suppress the fruits of the seizure of the Package and seeks an evidentiary hearing regarding same.  D. 378.  Colon has moved to dismiss Count III of the superseding indictment and, alternatively, has moved to sever Count III, requested an evidentiary hearing, moved to strike and/or dismiss any reference in Count III to fentanyl, and moved for a bill of particulars.  D. 364.  Colon also has moved to renew his motion to unseal its motion to dismiss.  D. 414.  The Court heard oral argument on the motions on August 8, 2023 and took the matter under advisement.  D. 692; D. 693.

### IV.    Diaz Fontanez's Motion to Suppress

Diaz Fontanez argues that agents unreasonably seized the Package in violation of the Fourth Amendment and, thus, all fruits of the seizure must be suppressed.  D. 378-1 at 5–10.  He further requests an evidentiary hearing to develop evidence as to the "source cities" and "package characteristics" criteria used by agents on due process and equal protection grounds, id. at 10–12, and maintains that the dog sniff was unreliable.  Id. at 12–13.

---

[5] On December 13, 2019, at Colon's detention hearing, the government introduced a version of the line sheet which removed the ellipsis after the word hero, stating in relevant part:

> COLON:  Oh, of the hero [ph] okay.  But that has to be like at 4 to be able to make some profit.

D. 364-4 at 3.  The government proffered this transcript with its witness at the detention hearing for Diaz Fontanez, eliciting testimony that the reference to "the hero" was meant to refer to heroin. See D. 265 at 14–15.

A.      **Diaz Fontanez Lacks Standing to Challenge the Seizure of the Package**

Invocation of the protection of the Fourth Amendment turns "upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy."  United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). The defendant has the burden of demonstrating "a reasonable expectation of privacy in the area searched and in relation to the items seized."  United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).   The First Circuit has highlighted the following factors as pertinent to the analysis: "ownership, possession and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of the case."  Id. at 856–57.  Status as the target of an investigation does not automatically confer standing.  Rakas, 439 U.S. at 134 (holding that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third party's premises or property has not had any of his Fourth Amendment rights infringed").

Diaz Fontanez has not demonstrated a legitimate expectation of privacy as to the Package. Diaz Fontanez states in an affidavit that the Package was "addressed to Angel T. Cortez," and does not otherwise claim a property or ownership interest in the Package as it moved through the mail stream.  D. 378-2 at 1.  The affidavit also does not assert any historical use of the Package or its contents and offers no indication that Diaz Fontanez could have regulated access to the Package on November 29, 2018, days before he had it in his possession.

The First Circuit addressed a similar situation in Stokes, where it considered whether a defendant could challenge the seizure of letters that were not addressed to him.  Stokes, 829 F.3d

14

at 52.  The First Circuit noted that "many of the federal courts of appeals have been reluctant to find that a defendant holds a reasonable expectation of privacy in mail where he is listed as neither the sender nor the recipient, at least absent some showing by the defendant of a connection."  Id. (collecting cases).  Seeing no such showing, the First Circuit concluded the defendant could not challenge the seizure of letters that were not addressed to him, despite an assertion in his affidavit that the "USPS had no right to seize, open and view my mail coming to me."  Id. at 52–53.

Diaz Fontanez's standing claim arguably is weaker than the defendant's in Stokes.  Unlike the affidavit there, Diaz Fontanez's affidavit makes no assertion that he was the intended recipient of the Package or that it otherwise belonged to him.  D. 378-2; see United States v. Contreras, No. 08-10219-GAO, 2010 WL 3258379, at *3 (D. Mass. Aug. 18, 2010) (characterizing as "dubious" the proposition that a defendant "has standing to challenge the search of a package of which he was not listed as either a sender or a recipient . . . and of which he disclaimed ownership") (internal citation omitted).  Diaz Fontanez also offers no evidence of a "bailment agreement" with Angel T. Cortez.  Cf. United States v. Bates, 100 F. Supp. 3d 77, 83–84 (D. Mass. 2015) (recognizing a privacy interest in mail not addressed to or sent by defendant where defendant entrusted the mail to an intended recipient in a bailment agreement).

As referenced above, moreover, Diaz Fontanez's status as a target of the investigation would not confer upon him standing as to the Package.  The Supreme Court considered, and rejected, a proposed rule that would have extended Fourth Amendment standing to "any criminal defendant at whom a search was 'directed.'"  Rakas, 439 U.S. at 132–33.  In rejecting this so-called "target theory," the Supreme Court emphasized that "[c]onferring standing to raise vicarious Fourth Amendment claims would necessarily mean a more widespread invocation of the exclusionary rule during criminal trial," which in turn "exacts a substantial social cost" by

excluding "[r]elevant and reliable evidence . . . from the trier of fact." Id. at 137. And to the extent Diaz Fontanez claims a brief, possessory interest in the Package upon his acceptance of its delivery, that interest did not obtain at the moment of the seizure, that is, when the Package was removed from the mail stream. See United States v. Goldsmith, 432 F. Supp. 2d 161, 169, 175 (D. Mass. 2006) (concluding a defendant had no Fourth Amendment interest in a crate of marijuana "at the times it was seized and searched," when it was not in his possession or control); see also United States v. Rose, 3 F.4th 722, 728 (4th Cir. 2021) (noting that "[w]hen a sealed package is addressed to a party other than the intended recipient . . . , that recipient does not have a legitimate expectation of privacy in the package absent other indicia of ownership, possession, or control existing at the time of the search"). Thus, because Diaz Fontanez has not met his burden of demonstrating a legitimate expectation of privacy in the Package, he has no standing to challenge its seizure by investigators.

**B.    The Seizure of the Package Was Reasonable**

Even assuming *arguendo* that Diaz Fontanez has standing to challenge the government's seizure of the Package, the seizure was reasonable.[6] It is the government's burden to prove that a warrantless seizure on the basis of reasonable suspicion is constitutional. United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998). Here, there are two facets of the government's conduct that warrant scrutiny, the initial seizure of the Package without a warrant and its subsequent detention.

---

[6] If Diaz Fontanez had established standing (which he has not, as discussed above), the government does not dispute that the removal of the Package from the mail stream constituted a seizure. See D. 413 at 12. Accordingly, the Court proceeds to the parties' dispute as to whether such seizure was reasonable.

1.     *Initial Seizure of the Package*

The government may seize a package on the basis of "reasonable suspicion that it contain[s] contraband." United States v. LaFrance, 879 F.2d 1, 4 (1st Cir. 1989); see United States v. Van Leeuwen, 397 U.S. 249, 252–53 (1970) (holding that reasonable suspicion may justify a brief detention of property); United States v. Allen, 990 F.2d 667, 671 (1st Cir. 1993) (holding that a postal inspector's detention of a package based on reasonable suspicion that it contained drugs did not violate the Fourth Amendment).

Here, agents had reasonable suspicion initially to seize the Package.  The investigation into the Package was conducted by Foley, who stated in an affidavit that he had been a U.S. Postal Inspector since 2008 and whose experience included investigations into "controlled deliveries of drugs to criminal offenders."  D. 413-2 ¶ 1.  Foley further stated that, based "on [his] training and experience," packages containing drugs often are shipped through priority mail and possess the following characteristics:  "(1) the package was mailed from, or addressed to, a narcotic source city; (2) the package has a fictitious return/sender address or name; (3) the package has address information which is handwritten; (4) the handwritten mailing label on the package does not contain a business account number, thereby indicating that the sender paid cash, credit or debit card; (5) the package was addressed from an individual to an individual; and (6) the package was heavily taped."  Id. ¶¶ 6–8.

The Package was shipped through priority mail, id. ¶ 3, and possessed a range of the putative characteristics of packages often containing drugs.  Id. ¶¶ 9–14.  The Package was shipped from Puerto Rico, which Foley identified as a "source area" for controlled substances based upon his own training and experience.  Id. ¶ 9.  The return/sender address was fictitious.  Id. ¶¶ 10–11.  Addresses were handwritten and associated with individuals.  Id. ¶ 14.  Moreover, Foley observed

that the Package was "heavily taped."  Id.  Thus, even assuming Diaz Fontanez has standing, the government met its burden of establishing reasonable suspicion that the Package contained drugs and that the initial seizure of the Package was lawful.

Moreover, to the extent that Diaz Fontanez was seeking an evidentiary hearing regarding the reasonable suspicion for the seizure of the Package, such is not warranted here.  An evidentiary hearing is required only when a defendant makes a "sufficient threshold showing" that material facts are in dispute which cannot reliably be resolved on the paper record and which would entitle the defendant to the requested relief if resolved in his favor.  United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996); see United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010).  To obtain an evidentiary hearing, a defendant must "allege[] facts sufficiently definite, specific, detailed and nonconjectural to enable the court to conclude that a substantial claim is presented."  Brown, 621 F.3d at 57.

Although the Court concluded that a hearing was necessary to hear the oral argument of the parties given the various challenges raised in his motion to suppress (and Colon's motion to dismiss), Diaz Fontanez has not met his burden in showing material facts in dispute to warrant an evidentiary hearing.  To the contrary, many of the assertions in his affidavit are consistent with the statements in the government's affidavits.  For instance, Diaz Fontanez asserts that the Package was "addressed to Angel T. Cortez" and expected to arrive at "387 Ashley Boulevard" in New Bedford, D. 378-2 ¶ 1, comporting with Foley's description of same, D. 413-2 ¶ 10.  Moreover, Diaz Fontanez's account of the delivery of the Package and his subsequent arrest, see D. 378-2 ¶¶ 2–6, is also consistent with the government's telling, D. 413-5 ¶¶ 15–16.

An evidentiary hearing is not warranted even understanding that the crux of Diaz Fontanez's request for an evidentiary hearing and discovery is that the "source cities" and "package

characteristics" criteria referenced in Foley's affidavit violates the Fourth Amendment as well as the Due Process Clause and the Equal Protection Clause.[7]  See D. 378-1 at 11–12.  The affidavit notes that the United States Postal Inspection Service ("USPIS") has established interdiction programs in cities throughout the United States and that these cities "have been identified as known sources of controlled substances," D. 413-2 ¶ 7, and makes clear that whether a package has been mailed from, or addressed to, a source city is one of several factors used by USPIS to assess its likelihood of containing controlled substances.  Id.  Diaz Fontanez asserts that this criteria is "racially motivated" (here, the source city was in Puerto Rico), D. 378-1 at 11, and, as he also contends, other of the generalized factors (handwritten label, payment in cash for shipping) arguably could be more a reflection of lack of resources than a likelihood that a package will contain contraband.  Postal Inspector Foley's affidavit, however, makes clear that he was not

---

[7] In support of his motion to suppress, Diaz Fontanez argues that the United States Postal Inspection Service's inclusion of such criteria is racially discriminatory in violation of the Due Process Clause and the Equal Protection Clause.  Whether suppression is the appropriate remedy for such claims of racial discrimination appears to remain an open question in this Circuit.  See United States v. Starks, 769 F.3d 83, 90 n.6 (1st Cir. 2014) (noting that "[a]lthough other circuits have held that an Equal Protection violation does not require suppression of otherwise legally obtained evidence, see United States v. Nichols, 512 F.3d 789, 794 (6th Cir. 2008) (overruled on other grounds), we have not yet opined on this issue").  The Court need not decide this issue here, however, because Diaz Fontanez has not sufficiently developed his equal protection or due process claims.  Given counsel's arguments regarding the disparate impact of certain of the factors that the USPS articulated, it appears that Diaz Fontanez's claims are akin to claims of selective prosecution or selective enforcement.  To warrant an evidentiary hearing in a selective prosecution case, the defendant must identify at least "some facts [ ] tending to show that he has been selectively prosecuted."  United States v. Saade, 652 F.3d 1126, 1135 (1st Cir. 1981); see United States v. Lewis, 517 F.3d 20, 25 (1st Cir. 2008).  A similar standard applies in the context of selective enforcement.  See McCoy v. Town of Pittsfield, NH, 59 F.4th 497, 508 (1st Cir. 2023) (noting that a claim of selective enforcement requires an initial showing of selective treatment compared with others "similarly situated").  Diaz Fontanez has not made that showing here, beyond counsel's arguments and his conclusory allegation that he believes the identification of source cities and package characteristics are based on implicit bias and racial profiling.  D. 378-2  ¶ 13.  Accordingly, as presently framed and on this record, the Court concludes that an evidentiary hearing is not warranted.  See Brown, 621 F.3d at 57.

relying solely upon such USPIS "intelligence" regarding same, D. 413-2 ¶¶ 6, 8, but his own training and experience (including the interception of over 300 Express/Priority Mail parcels which were found to contain controlled substances, id. ¶ 2) regarding such characteristics, id. ¶ 8, including not just the city of origin, the handwritten address label, that the sender paid cash (factors which Diaz Fontanez challenges), but also that the Package had a fictitious return address and it was heavily taped, which do not lend them to the same challenges of disparate impact that Diaz Fontanez suggests as to the other factors.  Given the undisputed record here regarding the basis for seizure of the Package, the Court denies any request for an evidentiary hearing.

### 2.    Detention of the Package

In determining the reasonableness of a parcel's detention, the First Circuit has emphasized that "time of detention is not necessarily synonymous with, or even a reliable proxy for, intrusiveness of detention."  Lafrance, 879 F.2d at 6.  Rather, the First Circuit has underscored the importance of balancing the individual's expectation of delivery against the government's interest "in detecting those who would traffic in deadly drugs for personal profit."  Id. at 7 (quoting United States v. Place, 462 U.S. 696, 703 (1983)).  To balance these dual interests, the Court must weigh investigatory diligence, the length of detention and information conveyed to the suspect.  Allen, 990 F.2d at 671–72.  Courts often consider the relevant time period for the purposes of analyzing reasonable suspicion to be any delay absent probable cause.  See id. at 672; LaFrance, 879 F.2d at 7.

Here, agents acted with diligence and the length of detention was minimal.  Postal Inspector Foley removed the Package from the mail stream on November 29, 2018, one day before it was scheduled to arrive at its delivery address.  D. 413-2 ¶ 14.  Foley contacted Officer Seibert the same day to conduct a dog sniff of the Package with Lucky.  Id. ¶ 15; see LaFrance, 879 F.2d at 8

(reasoning that a dog sniff evinces investigatory diligence because it "suggests an attempt to reduce any intrusion").  Officer Seibert arrived with Lucky at the Braintree Post Office that evening at approximately 6:16 p.m.  D. 413-2 ¶¶ 15–16.  Once Lucky indicated that the Package appeared to contain controlled substances, id. ¶ 16, agents no longer relied upon reasonable suspicion but probable cause.  The search warrant issued on November 30, 2018, the same day the Package was originally scheduled to arrive on November 30, 2018.  D. 412-1; D. 413-2 at 9.  Thus, any delay traceable to a seizure backed by reasonable suspicion did not intrude upon any individual expectation of delivery, especially where the individual interest at stake is not the interest of the addressee of the Package.  And because Diaz Fontanez is not the Package's addressee, the third LaFrance factor of "information conveyed to the suspect" has little bearing on the analysis, as any information regarding a potential delay in delivery would have been conveyed to Angel T. Cortez.  The government detention of the Package, thus, did not violate the Fourth Amendment.[8]

---

[8] Diaz Fontanez's challenge to the dog sniff is also unavailing.  "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  Florida v. Harris, 568 U.S. 237, 246 (2013); see United States v. Grupee, 682 F.3d 143, 147 (1st Cir. 2012).  Here, Foley's affidavit sets forth Lucky's certification and training to detect narcotic odors.  The affidavit states that "Officer Seibert and Lucky have attended and successfully completed a twelve-week training program run by the Barnstable County Sheriff's Office" and that "Lucky is certified to detect the presence of narcotic odors, including but not limited to marijuana, hash, cocaine, crack, heroin, ecstasy, and methamphetamine." D. 413-2 ¶ 15; see Harris, 568 U.S. at 246–47 (holding that where "a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search").  Officer Seibert also advised Foley that Lucky's certification remained in effect.  Id.  Seibert and Lucky are also required to train every day given the nature of Lucky's detection method, whereby "he eats only when he finds the target odor (narcotic odor)."  Id.  The affidavit further explained that Lucky completes sixteen hours of training with the Massachusetts Department of Officers each month and that Lucky has been involved in the successful seizure of packages containing controlled substances in the past.  Id.  These attestations are sufficient to establish the reliability of the dog sniff to establish probable cause as to the Package's contents.

## V.   Colon's Motion to Dismiss Count III

Colon moves to dismiss one of the charges against him in the superseding indictment, Count III charging him with conspiring to distribute or possess with intent to distribute heroin and fentanyl.  "When grading an indictment's sufficiency, [the court] looks[s] to see whether the document sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution of the same offense." United States v. Guerrier, 669 F.3d 1, 3-4 (1st Cir. 2011) (noting that "in the ordinary course of events, a technically sufficient indictment handed down by a duly empaneled grand jury 'is enough to call for trial of the charge on the merits'") (quoting Costello v. United States, 350 U.S. 359, 363 (1956)).  "The inquiry at this stage is not whether the government has sufficient evidence to prove the crime, but whether the allegations in the indictment are sufficient on their face." United States v. Thompson, 207 F. Supp. 3d 106, 109 (D. Mass. 2016).

Here, Count III of the indictment is sufficient on its face.  To prove a drug conspiracy charge under 21 U.S.C. § 846, the government must prove the existence of a conspiracy, the defendant's knowledge of the conspiracy and the defendant's knowing and voluntary participation in the conspiracy.  United States v. Negrón-Sostre, 790 F.3d 295, 308 (1st Cir. 2015).  Count III alleges that "from in or about February 2019 through at least April 2019, in New Bedford, Fall River, and Chicopee, in the District of Massachusetts, and elsewhere," Colon and Alejandro-Carrillo "conspired with each other and with other persons known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute" mixtures containing heroin and fentanyl.  D. 19 at 6.  Moreover, Count III alleges the specific quantities of heroin and fentanyl that were "reasonably foreseeable by, and [ ] attributable to" Colon, id. at 6–7, thus placing him on notice as to the applicability of 21 U.S.C. § 841(b) if convicted and "if the jury

finds him liable for the threshold drug quantity." United States v. Carmona-Bernacet, 600 F. Supp. 3d 155, 167 (D.P.R. 2022).

Colon does not dispute the facial validity of the superseding indictment. Rather, he urges the Court to dismiss Count III because the government is incapable of proving its case as to this charge, D. 364 at 18–20, its decision to bring the charge is "constitutionally outrageous," D. 364 at 21–22, and further contends grand jury discovery would provide another basis for dismissal. Id. at 22–28.

**A.    Dismissal of Count III Is Not Warranted**

*1.    Motion to Dismiss Is Not a Means to Test Sufficiency of Evidence*

Colon argues that Count III should be dismissed because the government cannot sustain a conviction as to Count III on the basis of the February 14, 2019 call line sheet including the word "hero," particularly in light of the government's prior assertion that this call reflected a cocaine transaction. D. 364 at 18; see 364-1 ¶ 69. Even if an indictment is facially valid, the First Circuit has noted that "a district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts," United States v. Musso, 914 F.3d 26, 29–30 (1st Cir. 2019) (citation omitted), but this limited basis for considering a challenge to a facially valid indictment does not apply here where the government disputes the validity of the motion and the limited view of the factual allegations that Colon relies upon in support of this motion.

Instead, the government notes that "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." D. 382 at 10 (quoting Guerrier, 669 F.3d at 4); see United States v. Rodríguez-Rivera, 918 F.3d 32, 33 (1st Cir. 2019) (recognizing that "a motion to dismiss a grand jury indictment does not provide an

occasion in this case for determining, over the government's objection, whether the facts alleged in the indictment are sufficient to establish the charged offense").  The crux of Colon's argument is that Count III is based solely on the government's contention that "hero" in the revised February 14, 2019 call refers to heroin.  Based upon the government's proffer, that is not the case.  See D. 664.  First, it is not the assertion alone in that conversation that bears upon the controlled substance at issue, but that the government alleges that Colon initially thought that Alejandro-Carrillo was discussing cocaine ("white stuff") and then realizes that his co-conspirator is talking about another controlled substance, heroin ("he asks for one and a half, 100, 125, it depends" and Colon responds "that has to be like at 4 to be able to make some profit").  Id. at 4–5.  Shortly thereafter, Alejandro-Carrillo confirms a quantity of "150" which Colon calls back to confirm as "one and a half."  Id. at 5–6.  Colon later calls Alejandro-Castillo to explain that his supplier could not fill this order, but he thinks it can get it for his customer by Saturday at a better price ("I think I can solve it for Saturday for sure and with a better number").  Id. at 6.  Colon calls back ten minutes later that he has found another source for the drugs and that his customer should have his money ready ("[t]ell him that is okay, [and] to have the tickets on hand").  D. 364-1 ¶ 76; D. 664 at 6.  The calls that follow are Colon and Alejandro-Carrillo arranging to meet.  D. 664 at 7.  Where they meet that day, on February 14, 2019, where they "fix the blue cabs" and "on Purchase," is in the vicinity of the Blue Bird Taxi company on 1551 Purchase Street in New Bedford.  Id.  This location is near Serrano's residence at 1541 Purchase Street, which when searched six days later, on February 20, 2019, had approximately 926 grams of heroin (later tested and determined to be

fentanyl and heroin) and 284 grams of cocaine (later tested to be 206 grams) and $27,000 in cash. D. 364-1 ¶¶ 80–81, 88; id. at 7–8.

It was not the February 14th surveillance alone that connected Colon to Serrano as a source of supply, but Colon and Alejandro-Carrillo's intercepted call two days after Serrano's arrest when they discuss his arrest and what was seized from him:  "[t]hey took a lot from him, 900 of the slow one and 250 white" indicates an understanding that Serrano had been arrested with drugs, but not just cocaine ("250 white").  D. 664 at 8–9.  The Count III conspiracy, alleged to have spanned from in or about February 2019 through at least April 2019, does not just rest on the allegations concerning February 14, 2019 and shortly thereafter, but upon other intercepted conversations with Colon about heroin/fentanyl.  The government proffers a March 21, 2019 call in which Colon asks Alejandro-Carrillo to get 50 grams of heroin/fentanyl.  Id. at 10 ("I need a half of the brown stuff" and "five instead of ten").  Colon also has multiple, intercepted calls with a co-conspirator not charged in this case, referred to herein as "B."  Although a number of those calls allegedly were about cocaine, the government proffers that some were about Colon arranging to sell B. heroin/fentanyl.  Id. at 11 (referencing April 8, 2019 call in which Colon confirms "[t]hat is 28, right" and "[t]hat's the dark one, right?").  Although Colon notes that no drugs were ever seized from him in this investigation, seizures were made from others, including from B., who on April 16, 2019 was arrested and a search of his apartment uncovered over 60 grams of cocaine and over 25 grams of fentanyl/heroin.  Id.   On this record, the Court cannot conclude that there is no

evidence to support Count III against Colon and, therefore, this basis of Colon's motion to dismiss fails.

> ### 2.     The Government's Conduct Was Not "Constitutionally Outrageous"

Similarly, given the evidence supporting Count III cited above, the argument that government's conduct in seeking to charge this offense was "constitutionally outrageous," D. 364 at 21–22, also fails.  "A defendant's claim of outrageous government misconduct faces a demanding standard, permitting the dismissal of criminal charges 'only in those very rare instances when the government's conduct is so appalling and egregious as to violate due process by shocking . . . the universal sense of justice.'"  United States v. Therrien, 847 F.3d 9, 14 (1st Cir. 2017) (quoting United States v. Luisi, 482 F.3d 43, 59 (1st Cir. 2007)); see United States v. Anzalone, 923 F.3d 1, 5 (1st Cir. 2019) (noting that the "constitutionally outrageous" conduct defense has "never succeeded in our Circuit").  Colon expressly rests this contention on the assertion that the government has "no evidence to prove its case." D. 364 at 21.  But as discussed above, the government has proffered sufficient evidence to support Count III.  Colon also relies upon the inconsistency about whether the February 14, 2019 call was about cocaine or heroin.  That the government's initial position, at least in its March 19, 2019 wiretap affidavit, posited in reference to "the white stuff" that Colon and Alejandro-Carrillo were negotiating a cocaine transaction in their February 14, 2019 call, D. 364-1 ¶¶ 69, 71, 75, and not a heroin deal when the transcript after the first one on February 16, 2019 translated the previously [unintelligible] later in the conversation as "hero," is not egregious conduct as to shock a "universal sense of justice" and warrant dismissal.  See United States v. Santana, 6 F.3d 1, 4–5 (1st Cir. 1993) (noting that the label of "outrageous misconduct" for cases involving "extreme physical, and possibly psychological, abuse of a defendant" or where law enforcement become so overinvolved in a felonious venture

that they can fairly be said either to have created the crime or coerced the defendant's participation in it and rejecting the dismissal of the indictment on outrageous misconduct grounds).   This is particularly true where Colon and Alejandro-Carrillo are charged in overlapping conspiracies to distribute and possess with intent to distribute cocaine in or about February 2019 through at least December 2019 (Count II, not challenged here) and to distribute and possess with intent to distribute heroin and fentanyl in or about February 2019 through at least April 2019 (Count III) and there is sufficient evidence to support both charges.

3.   *Motion to "Strike" the Fentanyl Allegation in Count III Is Also Not Warranted*

Colon also urges the Court to strike or dismiss Count III to the extent it alleges a conspiracy to distribute and possess with intent to distribute fentanyl.  As counsel agreed during oral argument, this motion to "strike" is at base a motion to dismiss as much of Count III that alleges that Colon conspired to distribute or possess with intent to distribute fentanyl.  Similar to the analysis in which Colon sought to dismiss Count III in its entirety, a motion to dismiss the fentanyl allegation in Count III may not test the sufficiency of the evidence of such charge, but only succeeds if there is no factual basis on which the charge could be made.  See United States v. Barbosa, 368 F. Supp. 3d 172, 175 (D. Mass. 2019).

Count III informed Colon of the charge against him, including an allegation that "40 grams or more of a mixture and substance containing a detectable amount of . . . fentanyl" were reasonably foreseeable by and attributable to Colon.  D. 19 at 6–7.  To the extent the Court can look beyond Count III to determine whether there is no factual basis to support the fentanyl allegation, here, there is a basis for the charge.  According to the government's proffer, subsequent laboratory testing revealed that the drugs recovered from Serrano's residence included "544 grams of fentanyl (some of which also contained heroin)," D. 664 at 8, and, as noted, agents observed

Colon near Serrano's residence during the alleged drug transaction with Alejandro-Carrillo on February 14, 2019.  Id. at 7.  The government also intercepted a call between Colon and Alejandro after Serrano's arrest suggesting that Serrano may have been their source for the alleged February 14 transaction.  Id. at 7–8.  Because there is some factual basis to support the inclusion of the fentanyl allegation in Count III, and the Court cannot test the sufficiency of this evidence at this stage of the proceedings, Colon's motion to dismiss the fentanyl allegation is denied.  See United States v. Wipp-Kelley, 98 F. Supp. 3d 405, 407 (D.P.R. 2015) (declining to dismiss a count in an indictment where defendant argued there was "no evidence" to support one of the count's elements because defendant was, in effect, "asking the Court to evaluate the sufficiency of the evidence against him").

## B.    Discovery from the Grand Jury Proceedings Is Not Warranted

Colon also argues that discovery from the grand jury proceedings will likely provide an additional basis for dismissal and should therefore be ordered by the Court.[9]  D. 364 at 23.  Colon maintains that he has a particularized need for discovery because "there was no probable cause as to the drug type and it therefore seems likely that the government obtained indictment through misrepresentation of the law, the facts, or both."  Id. at 26.  Colon insists that the prosecutor was required to disclose to the jury the fact that the Title III affidavit did not include the word "hero" when referencing the February 14, 2019 call.  Id. at 27.

One hallmark of the grand jury is the "secrecy of its proceedings."  Whitehouse v. United States Dist. Ct. for Dist. of R.I., 53 F.3d 1349, 1357 (1st Cir. 1995); see In re Lopreato, 511 F.2d 1150, 1152 (1st Cir. 1975) (recognizing that grand jury proceedings are entitled to a "presumption

---

[9] Specifically, Colon requests "[a] list of evidence and witnesses before the grand jury concerning Count [III]"; "[t]ranscripts of testimony before the grand jury concerning Count [III]"; and "[t]ranscripts of the government's instructions to the grand jury."  D. 364 at 28.

of regularity").   Rule 6(e) of the Federal Rules of Criminal Procedure imposes "an absolute obligation of secrecy regarding grand jury proceedings, with some very limited exceptions." United States v. Facteau, No. 15-cr-10076-ADB, 2016 WL 4445741, at *4 (D. Mass. Aug. 22, 2016).   Among these limited exceptions is Fed. R. Crim. P. 6(e)(3)(E)(ii), which permits the Court to authorize disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."   Only a "compelling necessity" warrants a review of grand jury proceedings.   United States v. Capozzi, 486 F.3d 711, 727 (1st Cir. 2007) (quoting United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958)); see United States v. Rodriguez-Torres, 570 F. Supp. 2d 237, 241 (D.P.R. 2008) (noting that Rule 6(e) "is not an invitation to engage in a fishing expedition to search for grand jury wrongdoing and abuse when there are no grounds to believe that any wrongdoing or abuse has occurred").

Here, Colon has neither identified a basis for dismissal, for the reasons discussed above, nor demonstrated a particularized need for the disclosure of grand jury materials.   The government has acknowledged that the prosecutor inadvertently excluded "hero" from the Title III wiretap affidavit dated March 19, 2019, where it characterized the February 14, 2019 call as solely about cocaine.   See D. 382 at 8.   The government also has noted that its grand jury presentation was consistent with its proffer to this Court that the February 14, 2019 call included the term "hero." As the government contends, Colon initially thought that Alejandro-Carrillo was talking about cocaine, but then realized that he sought heroin in this call, and that other calls and seizures revealed that Colon sold heroin/fentanyl as well as cocaine.   D. 664 at 3 & n.1-3.   To infer from this sequence that the government sought to deceive the grand jury into indicting Colon on Count III does not overcome the presumption of regularity that attaches to grand jury proceedings.   See United States v. Luthra, No. 15-cr-30032-MGM, 2018 WL 283892, at *3 (D. Mass. Jan. 3, 2018)

(concluding that "Defendant fails to satisfy her burden of demonstrating a particularized need to compel the government to produce the transcripts of the grand jury's legal charge"); see also Facteau, 2016 WL 4445741, at *5 (acknowledging that the disclosure of prosecutors' instructions would, among other things, promote the integrity of the grand jury process but declining to compel discovery because of the circumstances of the case and "the prevailing case law"). As to Colon's suggestion that the prosecutor was required to disclose its prior omission of "hero" from the February 14, 2019 call referenced in a Title III affidavit as exculpatory evidence, the Supreme Court has held that courts cannot impose a duty upon prosecutors to disclose exculpatory evidence to the grand jury. United States v. Williams, 504 U.S. 36, 51 (1992) (noting that "requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body"). The Court thus declines to compel discovery of grand jury materials.

## VI.   Colon's Motion for Alternative Relief

Because dismissal of Count III is not warranted, the Court turns to Colon's arguments made in the alternative.

### A.   <u>Motion to Sever Count III from Count II</u>

Colon argues that Count III alleging a heroin and fentanyl conspiracy should be severed from Count II which alleges a cocaine conspiracy. D. 364 at 25. He contends that the two counts were misjoined under Fed. R. Crim. P. 8(a), id. at 29, or, alternatively, that severance should be granted pursuant to Fed. R. Crim. P. 14. Id. at 31.

#### 1.   *Counts II and III Were Properly Joined*

Fed. R. Crim. P. 8(a) provides that "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar

character, or based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." "In determining whether counts are properly combined for trial, we historically have considered whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred." United States v. Taylor, 54 F.3d 967, 973 (1st Cir. 1995). Fed. R. Crim. P. 8(a) is "generously construed in favor of joinder." United States v. Melendez, 301 F.3d 27, 35 (1st Cir. 2002) (quoting United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996)). As such, "[a] defendant challenging such joinder must carry the devoir of persuading the trial court that a misjoinder has taken place." United States v. Natanel, 938 F.2d 302, 306 (1st Cir. 1991).

Here, Counts II and III were properly joined. Without repeating the summary cited above about the factual overlap between charges, particularly as to the allegations against Colon and Alejandro-Carrillo who was also charged in both counts, the Court notes that both charges allege violations of 21 U.S.C. § 846 and conspiracies to distribute and possess with intent to distribute controlled substances. See D. 19 at 4–7. The alleged conspiracies also commenced at the same time, that is, in or about February 2019. Id. at 1, 6. Although the conspiracy alleged in Count II lasted roughly eight months longer, Count III coincided entirely within Count II's temporal limits. The locations associated with each conspiracy are identical, both occurring in New Bedford, Fall River, and Chicopee. Id. In light of these similarities, Colon's misjoinder claim is unavailing.

### 2.    Severance Also Is Not Warranted Under Rule 14

Even if "Rule 8(a) is satisfied, a joint trial may be improper in consequence of the prejudice it may cause." United States v. Martínez, 994 F.3d 1, 12 (1st Cir. 2021). Where "joinder of offenses . . . appears to prejudice a defendant," Fed. R. Crim. P. 14(a) provides that "the court may order separate trials of counts . . . or provide any other relief that justice requires." "Some

prejudice results in almost every trial in which the court tries more than one offense together."

United States v. Richardson, 515 F.3d 74, 81 (1st Cir. 2008) (citing United States v. Burgos, 254

F.3d 8, 13–14 (1st Cir. 2001)). "Garden variety prejudice, however, will not, in and of itself,

warrant severance." Id. Instead for Rule 14(a) severance, a defendant "must demonstrate that the

prejudicial joinder likely deprive[s] him of a fair trial." Id. Of the types of prejudice that rise to

that level, Colon points to the scenario where "a defendant may wish to testify in his own behalf

on one of the offenses but not another, forcing him to choose the unwanted alternative of testifying

as to both or testifying as to neither." Id. (quoting United States v. Jordan, 112 F.3d 14, 16 (1st

Cir. 1997)).

Colon argues that severance is warranted under Rule 14 because the joinder of Counts II

and III precludes him from testifying in his own defense as to Count III. D. 364 at 31–32. "[T]o

deserve a severance of charges in such circumstances, a defendant must make 'a convincing

showing that he has both important testimony to give concerning one count and a strong need to

refrain from testifying on the other." United States v. Monteiro, 871 F.3d 99, 108 (1st Cir. 2018)

(quoting United States v. Alosa, 14 F.3d 693, 695 (1st Cir. 1994)). The defendant must "satisfy

the court that the claim of prejudice is genuine and to enable it intelligently to weigh the

considerations of economy and expedition in judicial administration against the defendant's

interest in having a free choice with respect to testifying." United States v. Tracy, 989 F.2d 1279,

1283 (1st Cir. 1993) (citation and internal quotation marks omitted).

Colon avers that he has "powerful exculpatory testimony to offer with regard to what was

actually said in [the February 14] phone call, what was contemplated in the call(s), whether there

was any drug transaction at or near 1551 Purchase Street, and whether [he] had any connection to

Ramon Serrano." D. 364 at 32. Beyond this proffer, Colon has not discussed any strong need to

refrain from testifying on Count II as to the cocaine conspiracy. Moreover, given the factual overlap between the conspiracies charged in Counts II and III, that Colon could choose to testify about an intercepted conversation allegedly referencing both cocaine and heroin and not be questioned about both substances, even at a severed trial on Count III, seems unlikely. See United States v. Alosa, 14 F.3d 693, 695 (1st Cir. 1994) (noting that while the courts "zealously guard a defendant's right not to testify at all, the case law is less protective of a defendant's right to testify selectively, addressing some issues while withholding testimony on others that are related"). The Court, therefore, does not conclude that joinder here prejudices Colon's interest in having a free choice to testify in his defense. On this record, severance is not warranted under Rule 14.

Colon also argues that Counts II and III should be severed because evidence of the alleged heroin transaction would not be admissible in a severed trial on the cocaine charge. D. 364 at 34. The Court does not agree. In every iteration of the February 14, 2019 transcript presented with the parties' motion papers, Colon asks about the "white stuff" (cocaine), which suggests the transcript could be relevant to the cocaine conspiracy alleged in Count II. Colon's "white stuff" comment may also indicate an intent to distribute drugs such that admission, alternatively, under Fed. R. Evid. 404(b) might be warranted in both trials, particularly where this call happened in the time period charged in the Count II cocaine conspiracy and the Count III heroin conspiracy. And as detailed above in summarizing the government's proffer, the February 14, 2019 call is not the only instance where Colon discussed both cocaine and heroin/fentanyl. See, e.g., D. 664 at 8–9 (discussing Serrano's arrest with Alejandro-Carrillo on February 22, 2019 and noting that "[t]hey took a lot from him, 900 of the slow one and 250 white"). Colon, therefore, has not identified evidence which would be admissible in a trial on Count III but inadmissible in the trial on Count II. See United States v. Gilbert, 92 F. Supp. 2d 1, 4 (D. Mass. 2002) (stating that "[i]f the evidence

of each of the crimes would be admissible in a separate trial for the other, the possibility of criminal propensity prejudice would in no way be enlarged by the fact of joinder") (quoting <u>Drew v. United States</u>, 331 F.2d 85, 90 (D.C. Cir. 1964)).[10]

**B.      <u>Request for an Evidentiary Hearing on February 14, 2019 Call Transcript</u>**

Colon requests that the Court hold an evidentiary hearing to consider the admissibility of any translated transcript for the February 14, 2019 call and further insists that the Court should exclude admission of this evidence before trial.  D. 364 at 37.  Colon's request rests on the following assertions:  that the transcript of the call is not the "best evidence" under the "best evidence" rule; that the utterances in the recording are not audible or intelligible; and that the translation is improper and unreliable.  <u>Id.</u> at 38–42.

As to the first assertion, the First Circuit has held that while the "best evidence rule requires that the tape recordings themselves must be furnished, absent agreement to the contrary," it "does not require that English translations of those tapes be excluded from evidence."  <u>United States v. Morales-Madera</u>, 352 F.3d 1, 9 (1st Cir. 2003).  "[W]hen transcripts are offered for use, either as evidence or a jury aid, they should be authenticated in the same manner as tape recordings that are offered in evidence, *i.e.*, by testimony as to how they were prepared, the sources used, and the

---

[10] Colon raises additional arguments that joinder is prejudicial, including the public's association of heroin and fentanyl with opioid overdose and death, that Colon has an "appreciable chance of acquittal," and that "fundamental fairness" calls for severance. D. 364 at 32–33, 36–37. None of these grounds are sufficiently developed beyond that regarding his interest in testifying as to Count III, but not as to Count II, as addressed above and, as presented on this record, do not warrant severance under Rule 14.  <u>United States v. Richardson</u>, 515 F.3d 74, 81 (1st Cir. 2008); <u>cf.</u> <u>United States v. Martinez</u>, 994 F.3d 1, 16-17 (1st Cir. 2021) (concluding that the defendant's Rule 14 challenge had merit where it was the "rare case" where the "government exposed [this defendant's] jury to days of evidence of how <u>other</u> public officials in a complex, alleged public corruption scheme in which she herself was not charged acted corruptly on behalf of the very figure [a co-defendant] who was alleged to have corruptly influenced [her] during roughly the same time period in the alleged corruption scheme for which she was charged") (emphasis in original).

qualifications of the person who prepared them."  United States v. Carbone, 798 F.2d 21, 26 (1st Cir. 1986).

The government indicates that it intends to move for leave to, *inter alia*, "introduce in evidence at trial copies of original recordings of intercepted telephone calls . . . ." and "English translations of those conversations."  D. 382 at 19.  The Court therefore denies Colon's motion for any hearing on if the February 14, 2019 call will be offered with any translated transcript at trial without prejudice to renewing such request as a motion in limine for trial.

To the extent Colon seeks an evidentiary hearing to resolve factual questions as to what Colon said on the February 14, 2019 call, the request is denied without prejudice.  The usual process for resolving such disputes is "for the district court to try to obtain a stipulated transcript from the parties before trial" and "[f]ailing such stipulation, each party should be allowed to introduce its own transcript of the recording provided that it is properly authenticated."  Morales-Madera, 352 F.3d at 8 (quoting United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986)).  If two transcripts of the same recording go to the jury, it should "be instructed that there is a difference of opinion as to the accuracy of the transcripts."  Id.  The Court reserves on whether any hearing, evidentiary or otherwise, would be necessary prior to trial pursuant to Rengifo or otherwise regarding any contested translations prior to admission at trial.

C.      **Request for a Bill of Particulars**

Under Fed. R. Crim. P. 7(f), a bill of particulars should be granted "if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause."  United States v. Sepulveda, 15 F.3d 1161, 1192–93 (1st Cir. 1993).  In determining whether to order the government to produce a bill of particulars, the Court also considers what the government has

produced beyond the four corners of the indictment.  See United States v. Nelson-Rodriguez, 319 F.3d 12, 30–31 (1st Cir. 2003).

Here, Colon's request for a bill of particulars sought specification on the transactions or intercepted calls other than on February 14, 2019 call upon which the government relies for Count III.  D. 364 at 44.  The government's proffer of anticipated evidence as to Count III, previously provided to the Court in August 2022 and now shared with the defense by order of this session, D. 664, obviates any need for a bill of particulars.  Accordingly, the Court denies Colon's request.

## VII. Conclusion

For the foregoing reasons, the Court DENIES Diaz Fontanez's motion to suppress, D. 378, and DENIES Colon's motion to dismiss Count III of the indictment, D. 364.  The Court also DENIES Colon's motions seeking alternative relief, id., except the Court DENIES without prejudice to any motion in limine that concerns the admission of any translated transcript of the February 14, 2019 call at trial.  The Court also will ALLOW IN PART Colon's (renewed) motion to unseal its motion to dismiss (and the government's opposition to same), D. 414, only as to the motion and supporting memorandum and opposition (and not the attachments) as described further below.[11]

---

[11] At the recent oral argument, the Court understood the government to agree that continued sealing of the line sheets was not warranted given that the two participants are Colon and Alejandro-Carrillo (who has been convicted and sentenced) and that the government had relied upon same at Colon's detention hearing, a public proceeding, and the upcoming trial scheduled for December 2023, another public proceeding.  Also, to the extent that there was reference to the other wiretap materials, namely the supporting affidavits, those exhibits are under seal.  Since it was not clear what the government was objected to as contained in the parties' briefing (as opposed to the attachments which will remain under seal), the Court will keep that briefing under seal until August 28, 2023 to allow counsel to confer about whether any redaction is necessary before the Court otherwise unseals the briefing.  Any such proposed redaction shall be filed by joint notice to the Court by August 28, 2023.  Given this ruling on this renewed motion, D. 414, the Court DENIES the remaining portion of Colon's original motion that sought unsealing, D. 359, as moot.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge